**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 13, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

SEAN KENDALL,

     Plaintiff - Appellant,

v.

BRETT OLSEN; BRIAN PURVIS;
JOSEPH ALLEN EVERETT; TOM
EDMUNDSON; GEORGE S. PREGMAN;
SALT LAKE CITY CORPORATION,

     Defendants - Appellees.

No. 17-4039
(D.C. No. 2:15-CV-00862-RJS)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BALDOCK**, **KELLY**, and **O'BRIEN**, Circuit Judges.
_____

     Sean Kendall sued Officer Brett Olsen, Lieutenant Brian Purvis and the Salt

Lake City Corporation (collectively "Defendants") and others under

42 U.S.C. § 1983 and state law for a warrantless search of his property that resulted

in the death of his companion dog. Kendall now appeals the district court's grant of

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. _See_ Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

summary judgment to Defendants on his federal claims. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

The following facts are undisputed unless otherwise noted.

In June 2014, Officer Olsen, Lieutenant Purvis and other members of the Salt Lake City Police Department responded to a call reporting that a three-year-old child was missing from his home. After officers searched the home and failed to find the boy, Lieutenant Purvis ordered Olsen and others to canvass the residential neighborhood for him, instructing them to search visually anywhere the child might have reached because the child could not communicate verbally. By this time, the child had been missing approximately one hour. Olsen and his fellow officers knew that time was of the essence in searching for missing children, with the likelihood of positive outcomes decreasing significantly after the first hour.

Olsen teamed with another officer to go house-to-house, knocking on doors and searching yards for the missing boy. Kendall's residence was approximately 10 houses from the boy's residence. When they reached it, the other officer knocked on the front door while Olsen walked up the driveway to visually check the fenced backyard. Olsen entered the yard through an unlocked gate and briefly checked the areas that had not been visible from over the gate. As he turned to leave, Kendall's dog, Geist, a 90-pound Weimaraner, appeared from behind a shed and began barking at Olsen. It is undisputed that Geist was 20-25 feet from Olsen when Olsen first saw him. Olsen testified at his deposition that the dog then charged him, barking and

2

growling with ears back and teeth bared. Olsen testified that he started to run towards the gate but then stood his ground when he realized he would not reach it in time. He further testified that when Geist continued to charge him aggressively, he drew his service weapon and shot and killed the dog a few feet from him. No one witnessed Olsen's confrontation with Geist. Kendall does not dispute that Geist barked loudly at Olsen and chased him when he ran, but otherwise disputes that Geist acted as Olsen described, based on his evidence that Geist was a friendly, non-aggressive dog who had never behaved in this manner. Shortly after Olsen shot Geist, the missing boy was found asleep in the basement of his home.

Kendall filed suit against Defendants and others in Utah state court, asserting federal and state claims relating to the incident. As relevant to this appeal, Kendall asserted section 1983 claims against Olsen and Purvis and a municipal liability claim against the City based on Olsen's alleged violation of Kendall's Fourth Amendment rights in the search of his property and seizure of Geist. After Defendants removed the case to federal court, the parties filed cross-motions for summary judgment on Kendall's federal constitutional claims. The district court granted summary judgment to Defendants on these claims and remanded the case to state court to resolve the state law claims. Kendall appeals.

## DISCUSSION

The district court granted summary judgment on the section 1983 claim against Olsen on qualified immunity grounds, and to Purvis and the City on the ground that their alleged liability was premised on Olsen having violated Kendall's Fourth

3

Amendment rights.  Accordingly, our review is focused on whether the district court properly determined on summary judgment that Olsen had qualified immunity against Kendall's constitutional claims.  We review this determination de novo.  *Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted).  "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009).  First, "[t]he plaintiff must demonstrate on the facts alleged . . . that the defendant violated his constitutional or statutory rights."  *Id.*  Second, the plaintiff must demonstrate "that the right was clearly established at the time of the alleged unlawful activity."  *Id.*

In determining whether a plaintiff has met this burden, we take the facts "in the light most favorable to the party asserting the injury," *Scott v. Harris*, 550 U.S. 372, 377 (2007), which "usually means adopting . . . the plaintiff's version of the facts," *id.* at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," *id.* at 380.  *See Redmond v. Crowther*, __ F.3d __, 2018 WL 798283, at *3 (10th Cir. Feb. 9, 2018) (in reviewing grant of summary judgment based on qualified immunity, we "ordinarily accept the plaintiff's version of the facts" as long as it finds some support in the record and is

4

not "blatantly contradicted by the record, so that no reasonable jury could believe it" (internal quotation marks omitted)).

## A.    Search

Searches without a warrant are presumptively unreasonable and therefore violate the Fourth Amendment subject to certain exceptions. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). One such exception is when "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Id.* (internal quotation marks omitted). We use a two-part test to assess whether such exigent circumstances exist: (1) Did "the officers have an objectively reasonable basis to believe there [was] an immediate need to protect the lives or safety of themselves or others"? And (2) was "the manner and scope of the search . . . reasonable"? *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006). "We evaluate whether a reasonable belief existed based on the realities of the situation presented by the record from the viewpoint of prudent, cautious, and trained officers." *United States v. Gambino-Zavala*, 539 F.3d 1221, 1225 (10th Cir. 2008) (internal quotation marks omitted). "Reasonable belief does not require absolute certainty; the standard is more lenient than the probable cause standard." *McInerney v. King*, 791 F.3d 1224, 1232 (10th Cir. 2015) (internal quotation marks omitted).

Officer Olsen's entry and search of Kendall's backyard was plainly reasonable under this standard and thus did not violate Kendall's Fourth Amendment rights. With regard to the first element of the test, "the need to assist persons who are

seriously injured or threatened with such injury" is one of the exigencies that can justify a warrantless search. *Brigham City*, 547 U.S. at 403. Here, Olsen had an objectively reasonable basis for believing there was an immediate need to take action to protect a three-year-old child from serious injury because: the child had been reported missing from the family home; a search of the home by other officers had not found the child; if, as it appeared, the child had wandered from the home, then he was at significant risk given his age and reported inability to communicate verbally; and the chances of finding the child unharmed were decreasing rapidly with the passage of time. The totality of these circumstances provided a reasonable basis to believe that an emergency existed. *See Najar*, 451 F.3d at 720 (describing focus of first element in two-part test).

The manner and scope of the search and Olsen's entry into Kendall's backyard as part of it were also reasonable. The scope of the search was defined first by proximity, that is the area around his home that a child that age might have been able to walk in the hour he had been missing. It was then refined by searching locations in this area that might have been accessible to a wandering child. There is no dispute that Kendall's home was proximate enough to the boy's home that he could have reached it in an hour. It is also undisputed that Kendall's backyard might have been accessible to a three-year old, because one or more of the gates was unlocked and the simple gate latch could be reached by a child that age. The parties also do not dispute that Kendall's search of the yard was brief, 90 seconds or less, and that he only looked at the areas that he had not been able to view from the gate. Under these circumstances, the scope and manner of the

6

search, including the search of Olsen's yard, were tailored to the emergency that prompted it and were reasonable.

Kendall argues that our precedent requires more than proximity and accessibility to establish that the search was reasonable. Instead, he argues, a search of a particular house or yard is unreasonable unless there is some specific information suggesting the individual in need of assistance, the missing child in this instance, could be located there. As support, Kendall points to our decision in *Gambino-Zavala*, in which we stated that to satisfy the *Najar* test "the government must show the officers reasonably believed a person *inside the home* was in immediate need of aid or protection," 539 F.3d at 1225 (emphasis added), and that the search was confined to "those places *inside the home* where an emergency would reasonably be associated," *id.* at 1226 (emphasis added, internal quotation marks omitted). This phrasing was appropriate in that case because the place searched was a home, or an apartment to be more precise. *See id.* at 1224-25. Here, by contrast, the place searched was an area where officers had reason to believe the missing child might be found, an area that included Kendall's yard. Locations within an area can be searched without a warrant if the particular facts of the case, as here, demonstrate that the search of the area and included locations was objectively reasonable as a result of exigent circumstances.

## B. Seizure

It is clearly established in this circuit and elsewhere that the killing of a pet dog by a law enforcement officer is a seizure that violates the owner's Fourth Amendment rights "absent a warrant or circumstances justifying an exception to the

7

warrant requirement." *Mayfield v. Bethards*, 826 F.3d 1252, 1256 (10th Cir. 2016); *see id.* at 1259 (noting that seven federal circuit courts have found the killing of a pet dog is a seizure within the meaning of the Fourth Amendment). One recognized exception to the warrant requirement is when exigent circumstances justify the seizure. *See United States v. Place*, 462 U.S. 696, 701 (1983). Olsen claims that exigent circumstances existed because a reasonable officer in his position would have believed that Geist posed an imminent danger to him.

The parties dispute whether Geist was acting aggressively and posed a threat to Olsen when he was shot. Even under Kendall's version of the facts, however, Geist, a large dog, appeared suddenly approximately 20-25 feet from Olsen, barking loudly, and then ran at Olsen when the officer started to run from him. Under these circumstances, Olsen would have had only a few seconds to react to the rapidly approaching dog. Under these circumstances, an officer could reasonably believe that Geist posed an imminent threat to his safety.

Kendall argues that Olsen was mistaken in this belief, and that even if Geist was a threat, shooting him was unreasonable because Olsen had other, non-lethal methods of defending himself, such as using his taser or baton. However, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor,* 490 U.S. 386, 396-97 (1989). While Olsen perhaps could have reacted differently, we cannot say that his split-second decision to use lethal force

8

was objectively unreasonable.  *See id.* at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

## CONCLUSION

Olsen was entitled to qualified immunity because Kendall did not demonstrate that Olsen violated his Fourth Amendment rights.  The district court's summary judgment in favor of Defendants on Kendall's section 1983 claims is therefore affirmed.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge